1

2                                                    **E-Filed 8/25/09**

3

4

5

6

7

8                IN THE UNITED STATES DISTRICT COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11   VERIZON CALIFORNIA INC., et al.,          Case Number C 08-2832 JF (RS)

12                      Plaintiffs,            ORDER[1] RE DEFAULT
                                               JUDGMENT DAMAGES
13          v.

14   ONLINENIC, INC.,

15                      Defendant.

16

17

18

19                          I. BACKGROUND

20          On December 19, 2008, Plaintiffs Verizon California Inc., Verizon Trademark Services

21   LLC, and Verizon Licensing Company (collectively "Verizon") obtained a default judgment in

22   the amount of $33.15 million against Defendant OnlineNIC Inc. ("OnlineNIC").  OnlineNIC

23   eventually sought to appear in the litigation and, in February 2009, filed a motion for relief from

24   judgment.  As recounted at length in this Court's order dated July 27, 2009 awarding sanctions

25   against OnlineNIC and denying OnlineNIC's motion for relief from judgment, the parties spent

26   the next six months litigating numerous issues pertaining to OnlineNIC's varying degrees of

27   compliance with the Court's post-judgment orders.  In its order dated July 27, 2009, the Court

28
     _____
          [1] This disposition is not designated for publication in the official reports.

1    found two independently sufficient grounds on which to deny the motion to set aside the default

2    judgment.  The Court also determined, however, that "in the interest of justice, Verizon w[ould]

3    be required to prove up its damages (including the proper per-violation amount of statutory

4    damages) in the context of the adversarial proceeding that ha[d] arisen since OnlineNIC appeared

5    in the litigation."  Order of July 27, 2009, at 23:12-15.  A hearing date and briefing schedule

6    were established for that purpose, and the Court heard argument on the matter on August 17,

7    2009.

8          In response to the Court's directive, Verizon filed a thorough opening brief and

9    supporting declaration setting forth numerous grounds upon which the Court should uphold its

10   earlier determination that $50,000 is an appropriate per-violation amount of statutory damages

11   for OnlineNIC's blatant and willful violation of the Anticybersquatting Consumer Protection Act

12   ("ACPA").  The ACPA establishes a range of $1,000 to $100,000 per violation for the type of

13   infringement committed by OnlineNIC.  *See* 15 U.S.C. § 1117(d); 15 U.S.C. § 1125(d)(1).

14   OnlineNIC filed an opposition brief on August 13, 2009, asserting that "only a jury trial can

15   address the issue of what the appropriate damages should be in this case," Opp. at 2:7-8, and that

16   the $33.15 million default award would violate substantive due process norms.  Concurrently

17   with its opposition, OnlineNIC filed a cross-motion for a jury trial to determine the proper

18   amount of damages.

19         As set forth more fully below, well-settled case law establishes that a party in

20   OnlineNIC's position has no entitlement to a jury trial for the purpose of determining damages.

21   Moreover, upon considering the evidence and argument presented by Verizon, as well as

22   OnlineNIC's limited opposition, the Court is fully satisfied that statutory damages in the amount

23   of $50,000 per violation are justified in light of the factors relevant to such determinations.

24   Finally, while OnlineNIC offers a cursory argument that the $33.15 million judgment would

25   violate its substantive due process rights, neither legal authority nor the facts of the instant case

26   support its position.

27

28

Case No. C 08-2832 JF (RS)
ORDER RE DEFAULT JUDGMENT DAMAGES
(JFLC3)

1

II. DISCUSSION

2  **A.    Entitlement to a jury trial**

3      **1. Seventh Amendment**

4      OnlineNIC argues that the Supreme Court's holding in *Feltner v. Columbia Pictures*, 523

5  U.S. 340 (1998)–that the Seventh Amendment "provides the right to a jury trial on all issues

6  pertinent to an award of statutory damages under 504(c) of the Copyright Act, including the

7  amount itself," *id.* at 355–should apply to the ACPA.  Yet, even assuming that the holding of

8  *Feltner* should be extended to the ACPA, "[c]aselaw dating back to the eighteenth century . . .

9  makes clear that the constitutional right to jury trial does not survive the entry of default." *Benz*

10 *v. Skiba, Skiba & Glomski*, 164 F.R.D. 115, 116 (D. Me. 1995) (citing *Brown v. Van Bramm*, 3

11 Dall. [U.S.] 344, 355 (1797)); *see also Adriana Int'l Corp. v. Lewis & Co.*, 913 F.2d 1406, 1414

12 (9th Cir. 1990) (holding that after default, "a party has no right to jury trial under either Fed. R.

13 Civ. P. 55(b)(2), which authorizes a district court to hold an evidentiary hearing to determine the

14 amount of damages, or the Seventh Amendment"); *Olcott v. Delaware Flood Co.*, 327 F. 3d

15 1115, 1124 (10th Cir. 2003) ("Defendants do not have a constitutional right to a jury trial

16 following entry of default."); *Graham v. Malone Freight Lines*, 314 F.3d 7, 16 (1st Cir. 1999)

17 ("Neither the Seventh Amendment nor the Federal Rules of Civil Procedure require a jury trial to

18 assess damages after entry of default."); *Henry v. Sneiders*, 490 F.2d 315, 318 (9th Cir. 1974)

19 ("[T]he Seventh Amendment right to trial by jury does not survive a default judgment.").  The

20 Seventh Amendment thus does not provide OnlineNIC with any entitlement to a jury trial on the

21 issue of damages.

22     **2. Statutory right to jury trial**

23     While OnlineNIC relies solely on the Seventh Amendment as the source of its purported

24 right to a jury trial, the Court also observes that OnlineNIC lacks any statutory right to a jury

25 trial.  Under certain limited circumstances, Federal Rule of Civil Procedure 55(b)(2) does

26 contemplate a jury trial in connection with the entry of a default judgment:

27         The court may conduct hearings or make referrals–preserving any federal statutory
        right to a jury trial–when, to enter or effectuate judgment, it needs to . . . (B)
28         determine the amount of damages.

3

Rule 55(b)(2), however, "preserves the right to a jury only when that right is protected by federal statute," *Pena v. Gonzalez*, 397 B.R. 566, 578 (1st Cir. 2008), and in fact "presupposes that a default judgment extinguishes the constitutional right to a jury trial," *Frankart Distributors v. Levitz*, 796 F. Supp. 75, 76 (E.D.N.Y. 1992). Thus, "Rule 55(b)(2) requires a jury trial after default *only* where a statute specifically provides for jury trial *after* default." *Benz*, 164 F.R.D. at 116 (emphasis added). Several courts have noted that the only such statute is 28 U.S.C § 1874, which "provides that in certain types of collection actions there is a right to jury trial *even after default* (or confession)." *Benz*, 164 F.R.D. at 116 (emphasis in original); *see also Shepherd v. Am. Broad. Cos., Inc.*, 862 F. Supp. 486, 491 n.4 (D.D.C. 1994), *vacated on other grounds*, 62 F.3d 1469 (D.C. Cir. 1995) ("The parties are clearly not entitled to a jury trial on the damages question. The sole federal statute that entitles defaulted parties to a jury damages trial is 28 U.S.C. § 1874."); *Gill v. Stolow*, 18 F.R.D. 508, 510 (S.D.N.Y. 1955), *rev'd on other grounds*, 240 F.2d 669 (2nd Cir. 1957); *Sells v. Berry*, 24 Fed. Appx. 568, 572 (7th Cir. 2001) (unpublished) ("In the case of a default, only 28 U.S.C. § 1874 may guarantee a right to a jury trial."); 5 James W. Moore, et al., *Moore's Federal Practice* ¶ 38.19[3] (1992) ("The only statute according a right of jury trial in a default case is 28 U.S.C. § 1874."). OnlineNIC therefore also lacks a statutory entitlement to a jury trial.[2]

---

[2] While the Court does have discretion to order a jury trial, *Frankart Distributors, Inc. v. Levitz*, 796 F. Supp. 75, 77 (E.D.N.Y. 1992), there is "nothing on this record [to warrant] exercise of the court's discretion to provide a post-default jury trial on damages," *Benz*, 164 F.R.D. at 117. The Court has been provided with more-than-adequate briefing on the subject of damages, and the "added expenses and delay that would inevitably result from [a jury trial] counsel against resort to that process, particularly in a case in which the plaintiff has already been required to expend more resources than justified by reason of the defendant['s] misconduct." *Lumbermen's Mut. Cas. Co. v. Holiday Vehicle Leasing Inc.*, No. 02-Civ.-137-(LAK)-(MHD), 2003 WL 1797888, at *2 (S.D.N.Y. April 4, 2003); see also *Frankart Distributors*, 796 F. Supp. at 77 ("In determining in its discretion whether to grant a jury trial after a default judgment, the court considers the reasons for the default as well as [the defendant's] use of dilatory tactics throughout the litigation."). OnlineNIC's conduct certainly does not merit discretionary recourse to a jury trial. *See generally* Order Re. Contempt Sanctions, dated June 23, 2009; Order re. Relief from Judgment, dated July 27, 2009.

4

1    **B.    Calculation of statutory damages**

2         "A plaintiff may elect statutory damages 'regardless of the adequacy of the evidence

3    offered as to his actual damages and the amount of the defendant's profits[,]' . . . . [and] [i]f

4    statutory damages are elected, '[t]he court has wide discretion in determining the amount of

5    statutory damages to be awarded, constrained only by the specified maxima and minima.'"

6    *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc*., 259 F.3d 1186, 1194

7    (9th Cir. 2001) (citations omitted) (discussing statutory damages provisions of the Copyright

8    Act); *Kiva Kitchen & Bath Inc. v. Capital Distrib. Inc*., 319 Fed. Appx. 316, 320 (5th Cir. 2009)

9    (unpublished) (quoting *Columbia Pictures*, 259 F.3d at 1194, for identical proposition under the

10   ACPA).  While the ACPA requires only that a court enter a damages award that it "considers

11   just," 15 U.S.C. § 1117(d), courts generally consider a number of factors in making such

12   determinations, including the egregiousness or willfulness of the defendant's cybersquatting, the

13   defendant's use of false contact information to conceal its infringing activities, the defendant's

14   status as a "serial" cybersquatter–i.e., one who has engaged in a pattern of registering and using a

15   multitude of domain names that infringe the rights of other parties–and other behavior by the

16   defendant evidencing an attitude of contempt towards the court or the proceedings.

17        **1. Egregiousness of cybersquatting conduct**

18        Of particular importance in determining the proper amount of damages is the

19   egregiousness of the defendant's cybersquatting.  *See Citigroup, Inc. v. Chen Bao Shui*, 611 F.

20   Supp. 2d 507, 513 (E.D. Va. 2009) ("Defendant's violative use [of the domain name

21   "citybank.org"] has been established as sufficiently willful, deliberate, and performed in bad faith

22   to merit the maximum statutory award of $100,000."); *Aztar Corp. v. MGM Casino*, No. NO.

23   00-833-A, 2001 WL 939070, at *5-6 (E.D. Va. April 9, 2001) (imposing $100,000 statutory

24   damages for infringing domain name based on defendant's "bad faith attempt to deceive Internet

25   consumers and profit from the good will Plaintiff has generated in its famous TROPICANA

26   mark," where defendant had registered "tropicanacasino.com").

27        OnlineNIC registered and monetized at least 663 domain names that are identical or

28   confusingly similar to Verizon's marks–domain names such as "mobileverizon.net,"

"myprepaidverizon.com," "verizon-cell-phones.com," "verizoncellularphone.com," etc. *See* Bradley Decl., Ex. D (attaching complete list of infringing domain names). OnlineNIC also hosted websites at many of the infringing domain names. The websites in turn appear to have contained "pay-per-click" advertisements designed to provide the domain name owner with revenue, Bradley Decl., ¶¶ 7-8, and in some cases also displayed links to goods and services in direct competition with those offered by Verizon, Bradley Decl., ¶¶ 5-6. OnlineNIC's goal clearly was "to register a domain name in anticipation that consumers would make a mistake, thereby increasing the number of hits [the] site would receive, and consequently, the number of advertising dollars [OnlineNIC] would gain." *Shields v. Zuccarini*, 254 F.3d 476, 484 (3rd Cir. 2001); *see also Verizon Cal. Inc., et al. v. Navigation Catalyst Sys., Inc*., 568 F. Supp. 2d 1088, 1097-98 (C.D. Cal. 2008). In other words, there is abundant evidence that OnlineNIC "intended to create . . . confusion in order to capitalize, for its own commercial gain, on the mistakes of consumers looking for Verizon's websites." Verizon Opening Br., at 6:8-9. Further, OnlineNIC appears to have used an automated process to identify domain names similar to Verizon's marks that would be likely to generate internet traffic. The use of automated programs to register large volumes of domain names in a single stroke was one of the "abuses of the domain name registration systems" that the ACPA was designed to deter. *See* S. Rep. No. 106-140, 1999 WL 594571, at 6-7 (1999). OnlineNIC's brazen violation of the ACPA warrants a large award of statutory damages–at a minimum $50,000 per violation.

Verizon also argues that OnlineNIC's registration of at least fourteen infringing domain names after June 27, 2008–the date on which Verizon's professional process server left a copy of the complaint, summons, and related court documents at the address listed on OnlineNIC's website as its mailing address–demonstrates willfulness. Since "[w]illfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice" of the allegations of infringement, such continued acts of infringement also may support a large statutory damages award. *Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002). It appears, however, that each of these domain names was registered over the course of several days at the end of June 2008, immediately following service of the complaint. *See*

6

1    Bradley Decl., Ex. C.  As reflected in the order dated July 27, 2009 denying OnlineNIC's motion

2    for relief from judgment, the issue of when OnlineNIC received notice of the lawsuit has been

3    hotly contested.  *See* Order re. Relief from Judgment, at 13:1-20:3.  While the Court rejected, as

4    simply not credible, OnlineNIC's assertion that it lacked notice of the lawsuit even after its

5    President, Rex Liu, personally signed for a package containing Verizon's complaint on July 17,

6    2009, the Court does not consider the registration of a limited number of additional domain

7    names prior to that time to be particularly strong evidence of willfulness.  As such, OnlineNIC's

8    registration of the fourteen additional infringing domain names does not materially affect the

9    Court's assessment of the proper amount of statutory damages.

10               **2. Use of false identities and affiliates to conceal cybersquatting activities**

11          Verizon argues that OnlineNIC's use of "numerous shell-entities . . . [and] fictitious

12   business[es] and persons" provides further support for a per-violation award of $50,000.  Courts

13   confronted with similar behavior have awarded statutory damages at the high end of the

14   spectrum.  *See, e.g.*, *Biocryst Pharms, Inc. v. Namecheap.com*, No. CV-05-7615 JFW, at *4

15   (C.D. Cal. Nov. 21, 2006) (awarding $100,000 per domain name where defendant "knowingly

16   provided false contact information concealing his registration and use of [the domain name]").

17   The Court finds that OnlineNIC engaged in such a pattern of concealment, and it agrees with

18   Verizon that this conduct further supports a per-violation award of $50,000.

19          Verizon has identified the following seven identities that OnlineNIC has used when

20   registering domain names: dehua manglang ciqi CO., LTD, fujian jinjiang baohuxie keji CO.,

21   LTD, gutian huangkai keji CO., LTD., hainan shiyongjun CO., LTD., lingyan yichang CO.,

22   LTD., junlong zheng, and lenawoo. Bradley Decl., ¶ 9 & Ex. G.  Verizon noted, first, that the

23   afore-mentioned aliases appeared in the complete WHOIS data fields of domain names registered

24   to "OnlineNIC, Inc."  Second, Verizon confirmed that OnlineNIC had admitted–in proceedings

25   before the National Arbitration Forum pursuant to the Uniform Domain Name Dispute

26   Resolution Policy–that it did business under the name "junlong zheng."  *See* Bradley Decl., ¶¶

27   17-22 & Exs. J-N.  Verizon discovered a similar pattern involving the alias "lenawoo."  *See*

28   Bradley Decl., ¶¶ 23-24 & Ex. O.  In fact, a comparison of the WHOIS data collected in

7

mid-November 2008 for several of the infringing domain names with the WHOIS data collected
for the same domain names on December 15, 2008 shows that the registrant names and addresses
were changed from "junlong zheng" to "lenawoo."  Bradley Decl., ¶ 25 & Exs. O-P.  Despite
these changes, and even more tellingly, the WHOIS form's "update dates" field–which is
controlled by the registrar, namely, OnlineNIC–was *not* altered to reflect the purported "change"
in registrant, Bradley Decl., ¶ 26 & Exs. O-P, indicating that OnlineNIC was, at a minimum,
complicit in concealing the purported change.

Even starker evidence of OnlineNIC's use of false identities is found in its practice of
"kiting" domain names–i.e., registering and un-registering domain names during ICANN's five-
day cancellation period in order to avoid the payment of fees and detection by trademark owners.
Here, the record reflects that OnlineNIC "kited" the domain names verizonnline.com,
verizioncareers.com, verzionlgphones.com, verizononephone.com, verizonphoneservices.com,
verizonpay.com, and verizonwirlelss.com, on numerous occasions, Bradley Decl., ¶ 13 & Ex. I,
but that each time the domain name was re-registered, new WHOIS data appeared, listing one of
the following identities: dehua manglang ciqi CO., LTD.; lingyan yichang CO., LTD.; fujian
jinjiang baohuxie keji CO., LTD.; hainan shiyongjun CO., LTD.; gutian huangkai keji CO., LTD.
Bradley Decl., ¶ 14.  Because only a registrar, or a registrant that is affiliated or interrelated with
the registrar, may delete a domain name registration and receive a refund or credit pursuant to
ICANN's policy, the systematic registration, use, deletion, and re-registration of these domain
names every three days, combined with the cycling the same five registrant identities in the
WHOIS form, demonstrates that the subject registrations were controlled by OnlineNIC and not
the purported registrants.  Bradley Decl., ¶ 15.  This conduct further supports a large award of
statutory damages.

### 3. Patterns of infringing conduct by OnlineNIC

In determining the proper amount of statutory damages, courts also consider whether the
defendant has engaged in a pattern of registering and monetizing large numbers of domain names
that infringe the rights of other parties.  *Electronics Boutique Holdings Corp. v. Zuccarini*, No.
Civ.A. 00-4055, 2000 WL 1622760, at *5 (E.D. Pa. Oct. 30, 2000) (awarding $100,000 per

8

1    infringing domain name and noting (1) defendant's pattern of registering names that "are

2    misspellings of famous names and infringe on the marks of others" and (2) the significant

3    number of cases brought by other trademark owners for the same type of infringement); *Lahoti v.*

4    *Vericheck, Inc*., No. C06-1132JLR, 2007 WL 4269791, at *14 (W.D. Wash. Dec. 3, 2007)

5    (concluding that plaintiff was "entitled to the maximum amount of statutory damages, $100,000,

6    based [in part] on . . . [defendant's] pattern and practice of registering domain names that

7    incorporate the trademarks of others . . . . "); *Citigroup Inc. v. Malik*, Civ. No. 1:07cv1168, 2009

8    WL 874497, at *6 (E.D. Va. March 24, 2009) (awarding $100,000 per infringing domain name

9    where defendants were "serial cybersquatters, whose prior conduct indicates a pattern of

10   wrongfully registering domain names designed to infringe on trademarks").

11          Verizon has provided evidence that OnlineNIC "operates a massive cybersquatting

12   operation," having registered and used over 900,000 domain names, many of them having been

13   "kited" and thus rendered difficult to detect.  To reveal the extent of OnlineNIC's cybersquatting

14   activities, Verizon selected twenty-six famous marks and sought to identify domain names

15   registered by OnlineNIC that infringed them.  Verizon discovered that OnlineNIC had registered

16   an extraordinary 14,700 domain names that infringed the mere twenty-six representative marks

17   selected.  While OnlineNIC denies that it operates a massive cybersquatting operation, it has

18   offered no evidence to contradict the factual record presented by Verizon.  OnlineNIC's status as

19   a serial cybersquatter further supports a per-violation award of $50,000.

20          **4. Contempt for the Court or judicial proceedings**

21          The Court already has recounted in great detail the numerous instances of sanctionable

22   conduct of which OnlineNIC is guilty.  *See generally* Sanctions Order, dated June 23, 2009;

23   Order re. Relief from Judgment, dated July 27, 2009.  The Court will not do so again here, but it

24   does note that OnlineNIC's noncompliance with court orders, as well as its systematically

25   deceptive behavior in evading service of process, further supports a per-violation award of

26   $50,000

27

28

9

**C.   Due process**

OnlineNIC argues that the total damages award of $33.15 million is so disproportionate to any actual harm suffered by Verizon, or to profit derived from the infringing domain names by OnlineNIC, that it transgresses the due process norms elaborated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).  There are numerous difficulties with OnlineNIC's argument.  First, the argument rests on OnlineNIC's own assertion that it derived only $1,468.60 in profit from the use of the 663 infringing domain names.  OnlineNIC's reference to its alleged profit fails to take any account of the damages suffered by Verizon in the form of a likelihood of confusion surrounding Verizon's marks and the diversion of internet traffic to websites selling rival products.  Moreover, OnlineNIC has made multiple false or misleadingly incomplete representations to Verizon and the Court over the course of this litigation, *see, e.g.*, Order re. Relief from Judgment, at 16:6-9 (noting OnlineNIC's provision of false addresses), 17:10-12 (same), 17:24-19:10 (noting Mr. Liu's "demonstrably false representations in . . . sworn declarations); *see also* Verizon Opening Br., at 14 n.12 (citing evidence of OnlineNIC's repeated misrepresentations concerning the nature of its relationship with 35 Technology), making it exceedingly difficult to accept OnlineNIC's present representations as credible.

Second, even if the figure offered by OnlineNIC were presumed to be accurate, the figure reflects only the profit purportedly derived *by OnlineNIC*, not by any of the numerous aliases that OnlineNIC used to register infringing domain names.  *See supra.  Compare* Bradley Decl., ¶¶ 9-28 (explaining OnlineNIC's use of aliases and shell identities), *with* ShaoHong Decl., ¶ 4 (purporting to summarize "all revenues received *by OnlineNIC* from all monetization of the 663 domains in question").  Third, while OnlineNIC urges the Court to apply the single-digit multiplier principle endorsed in *Campbell* to this case, the result would wholly defeat the purpose of the statute, since the maximum available damages award would be $13,212.00, or only $19.92 per domain name.  That is of course less than the statutory *minimum* prescribed by Congress.  *See* 15 U.S.C. § 1117(d).

10

1    Finally, and most importantly, it is highly doubtful whether *Gore* and *Campbell* apply to

2    statutory damages awards at all.  Like the Sixth Circuit, this Court "know[s] of no case

3    invalidating . . . an award of statutory damages under *Gore* or *Campbell*."  *Zomba Enterprises,*

4    *Inc. v. Panorama Records, Inc*., 491 F.3d 574, 587 (6th Cir. 2007).  Under binding authority

5    decided before *Gore*, "only where the [statutory] penalty prescribed is so severe and oppressive

6    as to be wholly disproportioned to the offense and obviously unreasonable" will it violate a

7    defendant's due process rights.  *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992)

8    (quoting *St. Louis, Iron Mt. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919)); *see also*

9    *Zomba Enterprises, Inc.*, 491 F.3d at 587 ("Regardless of the uncertainty regarding the

10   application of *Gore* and *Campbell* to statutory-damage awards, we may review such awards

11   under [*Williams*] to ensure they comport with due process."); *Arrez v. Kelly Services, Inc*., 522 F.

12   Supp. 2d 997, 1008 (N.D. Ill. 2007) ("In determining whether the penalty is grossly

13   disproportionate, 'the fine need only bear some relationship to the offense's gravity; this is not a

14   proportionality inquiry.'" (citation omitted)).

15   It cannot be said that the $33.15 million award bears such an impermissible relationship

16   to OnlineNIC's outrageously blatant and willful violation of federal law.  This is particularly true

17   when "due regard [is given to] the interests of the public, the numberless opportunities for

18   committing the offense, and the need for securing uniform adherence" to the statute.  *Williams*,

19   251 U.S. at 67; *see also Centerline Equip. Corp. v. Banner Personnel Serv., Inc*., 545 F. Supp. 2d

20   768, 777 (N.D. Ill. 2008) (rejecting defendant's argument that 30,000:1 ratio between potential

21   statutory damages and actual harm to plaintiff would violate due process, since "[t]here is no

22   requirement that the statutory remedy be proportional to the plaintiff's own injury [and] . . .

23   Congress may choose an amount that reflects the injury to the public as well as to the individual"

24   (citing *Williams*, 251 U.S. at 66)).[3]

25

26
_____

27      [3] Notably, OnlineNIC makes no argument under *Williams*, but states only that while "the
*State Farm* constitutional analysis has not yet been adopted to limit statutory damages under U.S.
28   intellectual property laws, nothing in *State Farm* suggest that its holding should not apply to such
cases."  Opp., at 4:6-9.

1    With respect to whether *Gore* and *Campbell* imposed limitations beyond those found in

2    *Williams*, at least one Court has concluded that since *Gore* and *Campbell* were designed

3    essentially to constrain the otherwise "unregulated and arbitrary use of judicial power" inherent

4    in punitive damages awards, their holdings are "not implicated [by] Congress' carefully crafted

5    and reasonably constrained" statutory damages regime under the copyright act and similar

6    legislation. *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 460 (D. Md. 2004);

7    *see also Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 281

8    (1989) (Brennan, J., concurring) (noting that greater scrutiny is warranted over non-legislative

9    punitive damages awards than over damages provided for by legislative enactment).

10    It is not difficult to see why *Gore* and *Campbell* have not been applied in the context of

11    statutory damages awards.  First, in the context of statutory damages, the Supreme Court has held

12    expressly that "[t]he discretion of the [district] court is wide enough to permit a resort to statutory

13    damages for [the purpose of deterrence,] [such that] . . . . *[e]ven for uninjurious and unprofitable*

14    *invasions of copyright*[,] the court may, if it deems it just, impose a liability within statutory

15    limits to sanction and vindicate the statutory policy." *F. W. Woolworth Co. v. Contemporary*

16    *Arts*, 344 U.S. 228, 233 (1952) (emphasis).  This suggests that ratios between actual or potential

17    damages and punitive damages–ratios that are at the heart of *Gore* and *Campbell*–simply do not

18    apply in the context of statutory damages.

19    Second, the very notion of "applying" *Gore* and *Campbell* to awards of statutory damages

20    is problematic.  Despite the use of the term "guideposts" to describe the relevant criteria for

21    assessing the constitutionality of damages, *Gore* and *Campbell* prescribe a relatively rigid

22    framework, one that results in considerable misalignment with the notions underlying statutory

23    damages of the kind authorized by the ACPA and similar statutes.  For example, in the context of

24    the first guidepost–the degree of reprehensibility of the defendant's conduct–"a court *must*

25    consider several issues: (1) whether the harm caused was physical as opposed to economic; (2)

26    whether the tortious conduct evinced an indifference to or a reckless disregard of the health or

27    safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the

28    conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the

12

result of intentional malice, trickery, or deceit, or mere accident." *Goldsmith v. Bagby Elevator Co., Inc*., 513 F.3d 1261, 1283 (11th Cir. 2008) (emphasis added).  Yet in the context of a typical copyright of trademark case, at least the first three of these sub-factors will be conspicuously irrelevant.

The second guidepost–"the disparity between the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award"–seems equally out of place, since a primary purpose of statutory damages is to facilitate–within clearly delimited parameters–the "necessarily somewhat arbitrary estimat[ion]" of the proper award where actual damages–and even "potential" damages–are difficult or impossible to determine.  *F.W. Woolworth Co.*, 344 U.S. at 232 (noting that statutory damages are intended to allow "owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages or discovery of profits"); *see also Lowry's Reports, Inc.*, 302 F. Supp. 2d at 460 ("The *Gore* guideposts do not limit the statutory damages here because of the difficulties in assessing compensatory damages in this case.").

The third "guidepost"–the difference between the remedy at issue and the civil penalties authorized or imposed in comparable cases–appears to rest almost entirely on the "fair notice" aspect of the due process limitations on damages awards.  As the Supreme Court noted in *Campbell*, "there are [both] procedural and substantive constitutional limitations" on damages awards that are punitive in nature.  *Campbell*, 538 U.S. at 416.  The procedural limitation inheres in the principle that "notions of fairness . . . dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *Gore*, 517 U.S. at 574.  That limitation clearly has no application in the field of statutory damages awards, where the text of federal legislation explicitly discloses the range of penalties that may be awarded on a per-violation basis.  Even assuming that, in certain types of cases, courts typically awarded damages in a certain range within the statutory parameters, it is difficult to argue that a defendant lacks notice of the potential severity of damages when the law explicitly identifies a maximum per-violation penalty and commits the determination of the proper amount of such penalty to the discretion of the trial judge.

13

1    Notwithstanding the imperfect fit between the *Gore*/*Campbell* framework and several of

2    the principles animating the ACPA's statutory damages regime, it is not inconceivable that *Gore*

3    and *Campbell* could "apply," in some respect, in the present context. "Although statutory

4    damages amounts might be calculated in part to compensate for actual losses that are difficult to

5    quantify, they are often also motivated in part by a pseudo-punitive intention to 'address and

6    deter overall public harm.'" *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 26 (2d Cir.

7    2003) (quoting *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1090 (W.D. Tex. 2000)); *see*

8    *also Cass County Music Co.*, 88 F.3d at 643 ("[S]tatutory damages have evolved and now are

9    intended not only to put the plaintiff in the position he would have been but for the infringement,

10   but also, and arguably preeminently, to punish [and deter] the defendant."). In that respect, while

11   courts frequently do consider whether a defendant has engaged in a pattern of registering or using

12   large numbers of domain names that infringe the rights of other parties, *see supra* Section II.B.3,

13   the Supreme Court has explained that a defendant should not be punished "for being an unsavory

14   individual or business," and that "[d]ue process does not permit courts, in the calculation of

15   punitive damages, to adjudicate the merits of other parties' hypothetical claims against a

16   defendant . . . . " *Campbell*, 538 U.S. at 423. Thus, while the defendant's wrongful conduct

17   against others certainly could be a relevant factor–for example, in assessing just how

18   reprehensible the defendant's conduct *towards the plaintiff* should be deemed under the

19   circumstances–a court authorizing an award that reaches well into realm of punitive or

20   deterrence-oriented damages must be careful not to punish the defendant for wrongful acts other

21   than to those committed against the plaintiff.

22   Among the material submitted by Verizon to support the original damages award of

23   $50,000 per violation is evidence that OnlineNIC runs a "massive cybersquatting operation." *See*

24   *supra* Section III.B.3. Viewed in this light, OnlineNIC would appear to embody the notion of an

25   "unsavory . . . business," but that is something for which it may not be punished, as such, under

26   *Campbell*. At the same time, however, it is clear that "a recidivist may be punished more

27   severely than a first offender[,] [since] . . . repeated misconduct is more reprehensible than an

28   individual instance of malfeasance." *Campbell*, 538 U.S. at 423. In the context of civil damages,

14

1  a court entering an essentially punitive award on the basis of "repeated misconduct" need only

2  "ensure [that] the conduct in question replicates the prior transgressions." *Id.* (quoting *Gore*, 517

3  U.S. at 577). Here, the wrongful conduct against other parties–the registration of many

4  thousands of domain names that infringe those parties' famous marks–is precisely the conduct

5  that has harmed Verizon. To the extent that the original damages award reflects a recognition of

6  the extent of OnlineNIC's illegal activities, it does so not by "adjudicat[ing] the merits of other

7  parties' hypothetical claims," *id*. at 423, but by placing a gloss of additional culpability on

8  OnlineNIC's conduct towards Verizon.

9      Finally, the original award furthers the important statutory goal of deterrence. *Cf. St.*

10  *Luke's Cataract and Laser Institute, P.A. v. Sanderson*, __ F.3d __, 2009 WL 1955609, at *15

11  (11th Cir. 2009) (observing that "the ACPA's statutory damages provision to contain[s] a

12  deterrence element similar to copyright law"); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 286

13  F.3d 270, 278 (5th Cir.2002) (noting that copyright statutory damages provision "is designed to

14  discourage wrongful conduct" and affirming statutory damages award of $25,000 under the

15  ACPA, even though plaintiff did not suffer any actual injury). Here, although evidence of actual

16  deterrence is not required to support a statutory damages award designed to deter OnlineNIC and

17  others from future misconduct, Verizon has represented to the Court that the number of domain

18  names that infringe its famous marks has decreased substantially since the entry of the default

19  judgment on December 19, 2008, and OnlineNIC admits that "publicity about the massive

20  judgment against [it] . . . gain[ed] much attention" in Asia beginning in late December 2008.

21  The judgment amount–which is fully supported by considerations relevant to the determination

22  of statutory damages awards under the ACPA–thus also serves the important statutory goal of

23  deterrence. *Cf. Campbell*, 538 U.S. at 417 (noting the unconstitutionality of awards that

24  "further[] no legitimate purpose and [therefore] constitute[] an arbitrary deprivation of

25  property").

26      For all of the foregoing reasons, the Court concludes that the original $33.15 million

27  damages award does not violate OnlineNIC's due process rights.

28

15

1    **C.    Attorneys' fees**

2         Verizon requests that it be awarded its reasonable attorneys' fees pursuant to 15 U.S.C. §

3    1117(a), which authorizes such an award "in exceptional cases" of trademark infringement.[4]  "A

4    trademark case is exceptional where the district court finds that the defendant acted maliciously,

5    fraudulently, deliberately, or willfully." *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d

6    1210, 1216 (9th Cir. 2003).  As an initial matter, OnlineNIC in its opposition offered no response

7    to Verizon's argument that this case is "exceptional" for purposes of § 1117.  OnlineNIC thus

8    has conceded the argument, and an award of fees is justified on that ground alone.  But the record

9    also speaks for itself.  OnlineNIC has registered and used at least 663 domain names that are

10   identical or confusingly similar to Verizon's marks.  As noted above, OnlineNIC even hosts

11   websites at many of these domains that display links to goods and services in direct competition

12   with those of Verizon.  Bradley Decl., ¶¶ 5 & 6, Exs. E & F.

13        "Cybersquatters often register well-known marks to prey on consumer confusion by

14   misusing the domain name to divert customers from the mark owner's site to the cybersquatter's

15   own site." *Shields v. Zuccarini*, 254 F.3d 476, 484 (3rd Cir. 2001).  Here, the infringing domain

16   names are used to provide pay-per-click advertisements that provide revenue to the domain name

17   owner each time they are clicked on by a web user.  Bradley Decl., ¶¶ 7 & 8.  In view of the

18   similarity between the 663 confusingly similar domain names and Verizon's marks, it is clear

19   that OnlineNIC's intent was to divert consumers searching for Verizon's websites.  *See Verizon*

20

21        [4] Section 1117(a) provides that in cases where the defendant is found to have violated §
22   1125(d), the plaintiff may recover in an amount equal to the defendant's profits, the plaintiff's
     actual damages, the plaintiff's costs, and, "in exceptional cases," the plaintiff's reasonable
23   attorneys' fees.  15 U.S.C. § 1117(a).  Subsection (d) modifies subsection (a) by permitting the
     plaintiff to seek statutory damages in place the defendants profits and the plaintiff's actual
24   damages.  15 U.S.C. § 1117(d).  Thus, a plaintiff that elects recovery pursuant to subsection (d)
25   may receive statutory damages, costs, and, if warranted, an award of its reasonable attorneys'
     fees.  Unlike the issue of whether a plaintiff seeking statutory damages under § 1117(c) for
26   violations of § 1116(d) may recover attorneys' fees under § 1117(a)–an issue that the Ninth
     Circuit suggested might be less than straightforward, *see K and N Engineering, Inc. v. Bulat*, 510
27   F.3d 1079, 1082 n.5 (9th Cir. 2007)–it is perfectly clear that a plaintiff seeking statutory damages
28   under § 1117(d) for violations of § 1125(d) may recover fees under § 1117(a), provided that the
     case is "exceptional."

                                                  16

1   *California Inc., et al. v. Navigation Catalyst Systems, Inc., et al.*, 568 F. Supp. 2d 1088, *18

2   (C.D. Cal. 2008) ("It is clear that [Defendants'] intent was to profit from the poor typing abilities

3   of consumers trying to reach Plaintiffs' sites: what other value could there be in a name like

4   ve3rizon.com? Further, the sites associated with these names often contained links to products

5   directly competitive with Plaintiffs' cellphone and internet businesses, potentially diverting

6   consumers who would otherwise have purchased goods or services from Plaintiffs away from

7   Plaintiffs.").  While Verizon has provided multiple grounds upon which to find this case

8   "exceptional," *see supra* Section III.B, this willful and outrageous conduct alone is sufficient for

9   the Court to conclude that Verizon must be awarded its reasonable attorneys' fees under § 1117.

### III. CONCLUSION

11          For the foregoing reasons, the Court concludes that the record fully supports the original

12   $33.15 million statutory damages award, and that such an award does not violate OnlineNIC's

13   procedural or substantive due process rights.  OnlineNIC is a serial cybersquatter that registered

14   an extensive selection of domain names that infringe Verizon's famous marks.  Moreover,

15   throughout the course of this litigation, OnlineNIC has engaged in misrepresentations and

16   perpetuated half-truths in an attempt to shield itself from the consequences of its illegal actions.

17   Finally, even if the propriety of the award presented a close question, either on statutory or

18   constitutional grounds, to reduce the amount of the judgment at this time and on the present

19   record would be inconsistent with the deterrence rationale of the ACPA's damages regime.

20   Accordingly, the Court will not disturb the original judgment entered on December 19, 2008.

21          OnlineNIC will be ordered to pay Verizon its reasonable attorneys' fees and costs.

22   Verizon shall submit documentation of its attorneys' fees not later than September 4, 2009.

23          OnlineNIC's motion for a jury trial on the issue of damages will be denied.

**IT IS SO ORDERED**.

DATED: 8/25/09

_____
JEREMY FOGEL
United States District Judge

17

Case No. C 08-2832 JF (RS)
ORDER RE DEFAULT JUDGMENT DAMAGES
(JFLC3)

This Order has been served upon the following persons:

David Jefferson Steele david.steele@cph.com, djslit@cph.com

Gary Scott Dukarich gsd@cph.com, kristen.geraci@cph.com

Howard Alan Kroll howard.kroll@cph.com, susan.lovelace@cph.com

Perry J. Narancic pnarancic@nk-pc.com

Sarah B. Deutsch sarah.b.deutsch@verizon.com

Scott R. Mosko scott.mosko@finnegan.com

18